UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KODAK GRAPHIC COMMUNICATIONS
CANADA COMPANY, AS SUCCESSOR TO
CREO INC.,                                                    REPORT & RECOMMENDATION
                                                                   and DECISION & ORDER
                          Plaintiff,

                                                                   08-CV-6553T
            v.


E. I. DU PONT DE NEMOURS AND
COMPANY,

                          Defendant.

_____


## PRELIMINARY STATEMENT

            By order dated May 14, 2009, the above-captioned matter has been referred to the

undersigned for the supervision of pretrial discovery and the hearing and disposition of all

non-dispositive motions, pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (B).  (Docket # 6).  Plaintiff

Kodak Graphic Communications Canada Company ("Kodak"), as successor to Creo, Inc., seeks a

declaratory judgment that defendant E. I. du Pont de Nemours and Company ("DuPont")

breached its contract with Kodak and is liable for damages.  (Docket # 1).  Currently pending

before the Court is defendant's motion to amend its answer and counterclaim.[1]  (Docket # 33).

For the reasons discussed below, I recommend that the district court deny DuPont's motion.

_____

[1] Also pending is a motion by DuPont for leave to file a supplemental declaration in connection with an
earlier motion to compel by Kodak.  (Docket # 65).  Because the motion to compel has been resolved, DuPont's
motion for leave to file a supplemental declaration is denied as moot.

## FACTUAL BACKGROUND

In 2002, DuPont and Kodak (then Creo) entered into a written agreement for the development of color filters for flat screen televisions and computer monitors (the "Agreement"). The Agreement obligated Kodak to produce the equipment for DuPont to sell to customers under its own name.  (Docket ## 1 at ¶ 10; 33 at 1).  In November 2007, the parties revised the Agreement for the ninth time ("Revision 9").  (Docket # 1 at ¶ 20).  Under Revision 9, DuPont agreed to buy four machines from Kodak, known as "EPS units," which Kodak agreed to deliver on a rolling schedule during the period October through December of 2008.  (*Id*. at ¶¶ 20-22).  In addition, the parties executed a Memorandum of Understanding (the "MOU") that "summarized the price, royalty and other cost terms" for additional EPS units that DuPont was to purchase from Kodak under a commercial supply agreement following the initial production.  (*Id*. at ¶ 27).  Pursuant to the MOU, DuPont agreed to pay 1.55 times the "fully loaded" manufacturing cost ("FLMC") for the first forty units.  (Docket # 37, Ex. C).  The MOU provided that the "Target FLMC" was $1.76 million.  (*Id*.).

Kodak failed to deliver any of the machines in the Fall of 2008 on the schedule provided in the Agreement.  (Docket # 1 at ¶¶ 33-39).  On December 1, 2008, DuPont terminated the Agreement, contending that Kodak's failure to deliver the EPS units on the agreed-upon schedule constituted a material breach.  (*Id*. at ¶¶ 40-41).  On December 8, 2008, Kodak filed the instant action, seeking damages and a declaratory judgment that DuPont, not it, had breached the Agreement.  (Docket # 1).

DuPont filed an answer and counterclaim on May 13, 2009, seeking a declaratory judgment that the Agreement, Revision 9 and the MOU were valid and enforceable contracts that

DuPont terminated for cause.  (Docket # 9 at ¶¶ 47, 53, 68).  In addition, DuPont asserted claims

for breach of contract and unjust enrichment and sought damages.  (*Id*. at ¶¶ 66, 76-79).  In

setting forth its counterclaim, DuPont alleged:

> It is now apparent that [Kodak] did not anticipate the level of
> design work required prior to accepting the order for the four EPS
> units – and agreeing to the required delivery dates.  [Kodak]
> apparently did not have a supply chain that could deliver parts in a
> timely manner.  In addition, [Kodak's] design had such significant
> problems that the EPS units required reworking at the same time
> they were being assembled.

(*Id*. at ¶ 35).  DuPont further alleged that in November 2008 it learned that Kodak had falsely

represented during its Revision 9 negotiations with DuPont that the design of the EPS units was

ninety percent complete, when in fact it was only seventy percent complete at that time.  (*Id*. at

¶ 30).

On June 26, 2009, this Court entered a stipulated scheduling order setting July 31,

2009 as the deadline for motions to amend the pleadings.  (Docket # 20).  Subsequently, the

scheduling order was amended several times, but an extension of the deadline for amending the

pleadings was never requested nor reset.  (Docket ## 26, 29, 30).  DuPont alleges that by May

2010 Kodak had produced over 300,000 pages of documents in discovery.  (Docket # 43 at ¶ 3).

On September 20, 2010, fourteen months after the deadline had expired, DuPont

filed the instant motion to amend its answer and counterclaim.  (Docket # 33).  DuPont proposes

to add allegations that Kodak fraudulently misrepresented its ability to deliver the EPS units in

order to induce DuPont to execute the various agreements.  Based on these allegations, DuPont

seeks to add a new counterclaim for misrepresentation and for a declaratory judgment that the

Agreement, Revision 9 and the MOU are void and unenforceable against DuPont because of

3

Kodak's misrepresentations.  (Docket # 33-1 at ¶¶ 86-92, 116-123).  Additionally, DuPont seeks

to add a claim that in 2007 Kodak wrongfully overcharged DuPont $1.6 million as a result of

double-billing errors.  (Docket # 33-1 at ¶ 67).  DuPont bases this claim upon an audit DuPont

conducted in the Fall of 2008.  (*Id.*).

DuPont contends that it did not discover the facts underlying the proposed

amendments until it reviewed Kodak's voluminous document production.  In support of this

contention, DuPont has submitted the affidavit of Stephen Toton ("Toton"), a DuPont employee,

who asserts:

> It was not until after Kodak produced its own internal e-mails in
> 2010 that I learned that back in 2007 Kodak's own employees were
> internally questioning [Kodak's representations to DuPont]. . . .
> This is the first time that DuPont had evidence of fraud and
> wrongful misrepresentation by Kodak.  It was not until we had
> Kodak's internal e-mails that we learned that Kodak's statements
> in 2007 were fraudulent and wrongful, not just innocent mistakes.

(Docket # 44).  In addition, DuPont asserts that its counsel "used diligence in reviewing the

hundreds of thousands of pages of Kodak documents that were produced in April and May 2010,

but there were problems with the metadata and there were other production issues which took

time to resolve, and then it took several months to wade through the hundreds of thousands of

documents that Kodak dumped on DuPont."  (Docket # 43 at 4).

DuPont identifies three material misrepresentations that it contends Kodak made

in order to induce DuPont to enter into Revision 9 and the MOU:  (1) the status of the design of

the EPS units; (2) the pricing of future equipment; and (3) Kodak's ability to meet the

agreed-upon delivery deadlines for the units.  (Docket # 33-1 at ¶ 37).

4

The factual allegations concerning the status of the design and the delivery schedule are related.  With respect to these, DuPont contends that on September 10, 2007, when the parties were negotiating Revision 9 and the MOU, Kodak General Manager Eran Elizur ("Elizur") represented that the design of the EPS units was ninety percent complete.  (Docket # 33-1 at ¶¶ 4, 19).  According to DuPont, fourteen months later, Kodak admitted that when Elizur made that representation, the design was only seventy percent complete.  (*Id*. at ¶ 62).

In addition, DuPont has provided this Court with copies of emails from Kodak's May 2010 production that DuPont asserts demonstrate that Kodak knew when it negotiated Revision 9 and the MOU that it would not be able to meet the production and delivery schedule. Specifically, one email from Kodak software "team lead[er]," Guy Sirton ("Sirton"), to Elizur in April 2007, states, "We are late and I don't see designers working late nights and weekends to try to catch up. . . . We are faced with an impossible dilemma:  Make no changes and have a product that doesn't meet requirements or make changes and miss the schedule."  (Docket # 42 at Ex. 1). Another internal email from Sirton in April 2007 states that Kodak has "lost contact with reality on this EPS schedule" and that the proposed fourteen-month production schedule was "impossible" to achieve.[2]  (*See* Docket # 91).

According to Kodak, Sirton stopped working on the EPS units in July 2007. (Docket # 42 at ¶ 14).  In addition, Kodak contends that it had a "large team of engineers who continued, between April and November [of 2007] to develop . . . the design of the EPS units, and that the EPS design continued to progress during those seven months.  Therefore, Mr.

---

[2] Another email from Sirton in April 2007 reveals that Kodak was then contemplating a fourteen-month schedule with a proposed first delivery in June or July 2008.  (Docket # 42 at 13).

Sirton's emails do not show what he – or anyone else – thought about [Kodak's] ability to deliver the EPS units at the time that the parties established delivery dates for the EPS units and entered into Revision 9 [in November 2007]."  (*Id.* at ¶ 20).

Finally, DuPont contends that Kodak misrepresented the future cost of equipment. Specifically, DuPont contends that Kodak knew when it negotiated the MOU establishing $1.76 million as the target FMLC for future units that the target was low and that the true cost would be higher; according to DuPont, Kodak knew by the Fall of 2008 that its projected costs would be nearly twice the target amount set forth in the MOU.  (Docket ## 33-1 at ¶ 69; 43 at 3).  In support of this allegation, DuPont has provided this Court with an August 2007 email from Elizur characterizing the estimated $1.76 million FLMC as "an aggressive cost reduction." (Docket # 43-4).  DuPont claims that it had no evidence that Kodak knew that its $1.76 million target was inaccurate until Kodak produced this email in April 2010.  (*See* Docket # 43 at ¶ 3.3).

Kodak opposes DuPont's motion to amend on the grounds that DuPont had sufficient information upon which to base the proposed counterclaim at the time it filed its original answer.  Specifically, Kodak points out that DuPont alleged in its original answer and counterclaim that it learned in November 2008, prior to the filing of this lawsuit, that Elizur had misrepresented the status of the design completion at the time Revision 9 was being negotiated. Indeed, DuPont's original answer asserts that Elizur himself admitted at a meeting (with DuPont representatives) on November 4, 2008 that the design had only been seventy percent completed in 2007, and not ninety percent completed.  (Docket # 9 at ¶ 30).  In addition, Kodak has demonstrated that the Elizur email describing the $1.76 million estimate as "aggressive" was initially produced to DuPont in October 2009 and re-produced again in April 2010.  (*See* Docket

6

# 92).  Kodak further contends that if DuPont is permitted to amend its answer and counterclaim, the case will be delayed by the need to conduct additional discovery.

## DISCUSSION

In determining a motion to amend filed after a court-ordered deadline for amending the pleadings, a court must balance the requirements of Rules 15(a) and 16(b) of the Federal Rules of Civil Procedure.  *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000).  Rule 15(a) provides that once the time for amending a pleading as of right has expired, a party may request leave to amend, which "the court should freely give . . . when justice so requires."  Fed. R. Civ. P. 15(a).  Generally, under Rule 15, if the underlying facts or circumstances relied upon by the party seeking leave to amend may be a proper subject of relief, the party should be afforded the opportunity to test the claim on its merits.  *See United States ex rel. Maritime Admin. v. Cont'l Ill. Nat'l Bank and Trust Co. of Chi.*, 889 F.2d 1248, 1254 (2d Cir. 1989).  "In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be 'freely given.'"  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Rule 16(b) directs the court to enter a scheduling order that limits the time to amend the pleadings.  Fed. R. Civ. P. 16(b)(1).  Moreover, the rule also provides that "[a] schedule may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b).  *See Parker v. Columbia Pictures Indus.*, 204 F.3d at 340.

In *Parker*, the Second Circuit addressed the showing required of a party moving to amend its pleadings after the time set by the court for filing such motions. 204 F.3d at 340. In that case, the court joined several other circuits in holding that "the Rule 16(b) 'good cause' standard, rather than the more liberal standard of Rule 15(a), governs a motion to amend filed after the deadline a district court has set for amending the pleadings." *Id*. (citing *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998) (*per curiam*) (considering Rule 15(a) without regard to Rule 16(b) would render scheduling orders meaningless); *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999) (court may require showing of good cause for motion to amend filed after deadline set forth in scheduling order), *cert. denied*, 529 U.S. 1038 (2000); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992) (Rule 16 was drafted to provide court with control over its docket and to prevent disruption, and thus denying leave to amend for lack of good cause shown is not abuse of discretion); *Riofrio Anda v. Ralston Purina, Co.*, 959 F.2d 1149, 1154-55 (1st Cir. 1992) (finding that it was not an abuse of discretion to deny leave to amend pursuant to Rule 16, despite lenient standards of Rule 15)).

According to the Second Circuit, "despite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause." *Parker*, 204 F.3d at 340. *See Phaneuf v. Tenneco, Inc.*, 938 F. Supp. 112, 115 (N.D.N.Y. 1996) ("[i]n instances where . . . a considerable amount of time has passed between filing the complaint and the motion to amend, courts have placed the burden upon the movant to show some valid reason for his or her neglect and delay") (internal quotation marks omitted) (quoting *Sanders v. Thrall Car Mfg. Co.*, 582 F. Supp. 945, 952 (S.D.N.Y. 1983), *aff'd*, 730 F.2d 910 (2d Cir.

1984)).  "Good cause," the court reasoned, "depends on the diligence of the moving party." *Parker*, 204 F.3d at 340.  *Accord Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009); *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007) (court's primary consideration in determining whether a movant has established good cause is "whether the moving party can demonstrate diligence"); *Carnrite v. Granada Hosp. Group, Inc.*, 175 F.R.D. 439, 446 (W.D.N.Y. 1997) ("'[g]ood cause' means that scheduling deadlines cannot be met despite a party's diligence").

The moving party may demonstrate "good cause" by moving to amend promptly after the discovery of new evidence following the scheduling deadline.  *See Estate of Ratcliffe v. Pradera Realty Co.*, 2007 WL 3084977, *4 (S.D.N.Y. 2007) (party demonstrated requisite diligence by moving to amend ten days after discovering new evidence in a deposition).  A party that inexcusably delays after determining that it wishes to allege new claims, whether by discovering new evidence or otherwise, will not satisfy the good cause standard.  *See*, *e.g.*, *Volunteer Fire Assoc. of Tappan, Inc. v. Cnty. of Rockland*, 2010 WL 4968247, *4 (S.D.N.Y. 2010) (good cause lacking where plaintiff failed to move to amend complaint until four months after advising court that it wished to do so); *Rambarran v. Mt. Sinai Hosp.*, 2008 WL 850478, *3 (S.D.N.Y. 2008) (good cause not demonstrated where plaintiff moved to amend five months following the deadline and failed to identify the new evidence giving rise to the new claims or when such evidence was discovered); *Baergas v. City of New York*, 2005 WL 2105550, *10 (S.D.N.Y. 2005) (two-month delay in filing motion to amend after advising court of intent to do so did not satisfy good cause standard).

In determining whether to grant a motion to amend, the court must weigh the good cause shown for the delay against the prejudice to the non-movant that will result from the amendment.  *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 46-47 (2d Cir. 1983). Considerations of prejudice include whether the new claim would:  (1) require significant additional discovery; (2) significantly delay the resolution of the dispute; or (3) prevent the non-moving party from bringing a timely action in another jurisdiction.  *Block v. First Blood Assoc.*, 988 F.2d 344, 350 (2d Cir. 1993).  "However, the absence of prejudice to a nonmoving party does not alone fulfill the good cause requirement of Rule 16(b)."  *Woodworth v. Erie Ins. Co.*, 2009 WL 3671930, *3 (W.D.N.Y. 2009) (citing *Estate of Radcliffe v. Pradera Realty Co.*, 2007 WL 3084977 at *1) (emphasis omitted).

Here, DuPont contends, on the one hand, that the proposed amendments are "mere clarifications and embellishments of DuPont's prior, already existing claims."  (Docket # 43 at 4).  On the other hand, DuPont contends that it has established good cause to amend its answer because it recently discovered the facts giving rise to its proposed counterclaim.  *See Oppenheimer & Co. v. Metal Mgmt., Inc.*, 2009 WL 2432729, *3 n.3 (S.D.N.Y. 2009) ("there obviously is some tension between [defendant's] contention that its proposed amendments [to its answer] raise no new issues, add no new parties, and are based upon the same set of operative facts as those in the original pleadings, . . . and therefore are not prejudicial, and its claim that certain newly-discovered evidence forms the basis for its motion to amend") (internal quotation omitted), *aff'd*, 2010 WL 743793 (S.D.N.Y. 2010).  On the issue of recently-discovered facts, DuPont maintains that it had assumed before discovery that Kodak's failure to perform was caused by innocent mistakes, such as inadequate project management; only after review of the

10

above-described emails did it learn that at the time of the negotiations Kodak knew that it could

not deliver on its promises.  As DuPont asserts, "it was not until DuPont had an opportunity to

review [Kodak's] internal documents (produced up to May 24, 2010) that DuPont was able to

appreciate the combined impact of [Kodak's] actions and to flesh out its counterclaims

accordingly."  (Docket # 40 at 3).  Indeed, DuPont argues that denial of its motion would

improperly encourage the practice of "over-pleading" in the initial filings.  (Docket # 43 at 6).

On the record before me, I find that DuPont has failed to establish good cause for

its proposed amendments because it has failed to demonstrate that they are based upon new

evidence and that it acted diligently in bringing them.  First, DuPont's amended counterclaim for

$1.6 million in overcharges must be denied because DuPont had the factual basis upon which to

assert this claim – the results of an audit conducted in November 2008 – prior even to filing this

complaint.  The same analysis applies to DuPont's allegation that Kodak had not been truthful

when Elizur represented in September 2007 that the project design was ninety percent complete;

DuPont made this same allegation in its original answer and counterclaim.  (Docket # 9 at ¶ 30).[3]

The only information DuPont has presented that was discovered after the deadline

for motions to amend are some of the emails from Elizur and Sirton.  For instance, Kodak has

---

[3]  DuPont has cited caselaw in this Circuit holding that a motion to amend may be granted even without a showing of good cause where the opposing party would not be prejudiced.  *See, e.g.*, *Nycomed U.S. Inc. v. Glenmark Generics Ltd.*, 2010 WL 1257803, *11 (E.D.N.Y. 2010) ("delay alone, in the absence of bad faith or prejudice, is usually not sufficient reason for denying a motion to amend"); *New Yuen Fat Garments Factory Ltd. v. August Silk, Inc.*, 2009 WL 1515696, *4 (S.D.N.Y. 2009) (permitting amendment, which was based upon facts known at the time of the original complaint, in the absence of showing of prejudice).  A review the caselaw in this Circuit reveals a split of authority on the issue of whether the moving party must make a threshold showing of good cause before the Court considers prejudice or whether prejudice should be considered irrespective of good cause.  After consideration of the relevant Second Circuit law, this Court finds that the former is the better approach, and is the one that has been most consistently followed in this district.  *See Woodworth v. Erie Ins. Co.*, 2009 WL 3671930 at *3 ("the absence of prejudice to a nonmoving party does not alone fulfill the good cause requirement of Rule 16(b)").  Accordingly, because I find that DuPont has not shown good cause for the amendments, I do not consider whether Kodak would be prejudiced by the proposed amendments.

demonstrated that the Elizur email regarding the $1.76 million estimate was first produced to

DuPont in October 2009 and then again in April 2010.  Accordingly, nearly a year before this

motion was filed, DuPont had the basis to allege that Kodak misrepresented the FLMC of future

units.  Its failure to move in a more timely manner amounts to impermissible delay and does not

satisfy the good cause standard.  *Lawrence v. Town of Cheektowaga*, 2006 WL 2000124, *3

(W.D.N.Y. 2006) (delay of nearly one year after plaintiff obtained information giving rise to

requested amendment defeated motion to amend complaint).

Thus, of all the alleged new evidence relied upon by DuPont, only the April 2007

emails from Sirton were unknown to DuPont until Kodak's May 2010 document production.[4]

Accordingly, I must determine whether discovery of those emails justifies the addition of a claim

for misrepresentation based on the allegation that Kodak "wrongfully induced DuPont to enter

into the Ninth Amendment and the MOU by making material misrepresentations concerning . . .

[Kodak's] ability to meet the deadlines in the Ninth Amendment."[5]

If the amendment proposed by the moving party is futile, "it is not an abuse of

discretion to deny leave to amend."  *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir.

1993) (*per curiam*).  "An amendment to a pleading is futile if the proposed claim could not

withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)."  *Lucente v. Int'l Bus.

Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (citing *Dougherty v. Town of N. Hempstead*

---

[4]  Kodak does not dispute that these emails were not produced until April or May 2010.  (*See* Docket # 42).

[5]  DuPont's proposed amended complaint does not set forth any facts regarding Sirton's emails.  (*See* Docket # 32-1).  Rather, counsel presented those emails to the Court during oral argument on this motion.  Because counsel requested permission to replead in the event that this Court found that the proposed amended complaint did not comply with the specificity requirement of Rule 9(b) of the Federal Rules of Civil Procedure (Docket # 56 at 40), this Court will consider whether the facts, as DuPont has presented them, could be pleaded to state a claim for misrepresentation.

*Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)).  To avoid dismissal, the proposed

amended claim must contain "sufficient factual matter, accepted as true, to 'state a claim to relief

that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

> "Common law fraud in Delaware requires: 1) the existence of a false

representation, usually one of fact, made by the defendant; 2) the defendant had knowledge or

belief that the representation was false, or made the representation with requisite indifference to

the truth; 3) the defendant had the intent to induce the plaintiff to act or refrain from acting;

4) the plaintiff acted or did not act in justifiable reliance on the representation; and 5) the plaintiff

suffered damages as a result of such reliance."[6]  *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d

129, 144 (Del. Ch. 2003) (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del.

1983)); *accord Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 115 (Del. 2006).

"Equitable fraud differs from common law fraud in one respect – the defendant need not know

that the representation is false."  *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d at 115.

> As to the first factor, "the putative misrepresentation must involve either a past or

contemporaneous fact or a future event that falsely implies an existing fact."  *Grunstein v. Silva*,

2009 WL 4698541,*13 (Del. Ch. 2009) (internal quotation omitted).  Further, "[a] false assertion

presupposes that an event has occurred, that a duty has been performed, that a fact has intervened

or that an authority exists . . . [to] induce[] the contract."  *Id.*  In contrast, "statements which are

merely promissory in nature and expressions as to what will happen in the future are not

---

[6]  The parties agree that Delaware law governs DuPont's misrepresentation claim.  (Docket ## 38 at 12, n.4; 40 at 4).

actionable as fraud" because "[r]epresentations as to what will be performed or will take place in the future are regarded as predictions and hence are not fraudulent." *Id.* Where, however, "particularized facts are alleged that collectively allow the inference that, at the time the promise was made, the speaker had no intention of performing," a fraud claim may lie for "an unfulfilled promise of future performance." *Id.*; *accord Microstrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, *15 (Del. Ch. 2010).

In the case at bar, DuPont alleges that Sirton's emails prove that Kodak knew at the time Revision 9 was signed that it did not have the ability to meet the deadlines contemplated in the Agreement. Thus, DuPont alleges that Kodak falsely represented its ability to perform the contract. Indeed, the proposed amended counterclaim alleges, "[Kodak] either never intended and/or was never prepared to fully perform its promises and obligations as stated in the Ninth Amendment and MOU, despite representations to the contrary." (Docket # 33-1 at ¶ 42). This claim does not allege that Kodak misrepresented that "an event has occurred, that a duty has been performed, that a fact has intervened or that an authority exists . . . [to] induce[] the contract." *Grunstein v. Silva*, 2009 WL 4698541 at *13. Rather, DuPont's allegations amount to a claim for promissory fraud – that at the time Kodak made its promise to perform the contact, it had no intent to do so. In order to make out this claim, DuPont must "plead specific facts that lead to a reasonable inference that the promisor had no intention of performing at the time the promise is made." *Microstrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455 at *15 (quoting *Grunstein*, 2009 WL 4698541 at *13).

Sirton's emails, even if considered along with the allegations of the proposed amended counterclaim, do not meet this standard. Sirton's emails reveal that in April 2007 he

14

told others within Kodak, including Elizur, that the then-contemplated fourteen-month delivery schedule was unrealistic, noting that engineers and designers were not then working weekends and overtime.  Revision 9 was not executed until seven months later (November 2007) and did not provide for the first delivery to occur until October 22, 2008 – four months later than the schedule that Sirton had characterized as unrealistic.  (Docket # 33-1 at ¶ 26).  Thus, even accepting that Sirton's emails could illuminate Kodak's intentions in April 2007, they have little relevance on the issue of Kodak's intentions and ability seven months later to build the EPS machines on a more generous timeline than was being negotiated at the time of the emails.  To allow DuPont to allege this claim on the basis of Sirton's emails would permit DuPont to "bootstrap a breach of contract claim into a fraud claim."  *Grunstein*, 2009 WL 4698541 at *12. *See also BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*, 2004 WL 1739522, *8 (Del. Ch. 2004) ("[o]ne cannot 'bootstrap' a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations") (internal quotation omitted).

Setting aside the issue whether Sirton's emails alone support a misrepresentation claim, I also reject DuPont's argument that it did not have a basis for alleging misrepresentation until it reviewed Kodak's production as a whole and discovered the full extent of Kodak's misrepresentations.  Although DuPont knew at the time of first filing its answer that Kodak had misrepresented the status of its design in September 2007 as ninety percent instead of seventy percent, DuPont contended at oral argument on this motion that Kodak's document production revealed that even the seventy percent estimate was too generous and that Kodak was, in fact, much farther behind on the design.  (Docket # 56 at 22).  Thus, DuPont argues that although it had always known that Kodak had misrepresented the status of the design, Sirton's emails and

15

the emails regarding the FLMC, combined to paint a far more egregious picture of Kodak's inability to perform its contractual obligations.

       Upon careful consideration, I do not find this argument persuasive because I find that DuPont had all the necessary information to plead a misrepresentation claim much earlier that it did.  As discussed above, Sirton's April 2007 emails are not probative of the status of the design or Kodak's ability to deliver the machines on the schedule agreed upon in November 2007.  Neither is Kodak's estimate of the future price of equipment.  Thus, although Sirton's emails may have revealed to DuPont that Kodak's alleged lack of preparation was more acute in September 2007 than it initially had believed, the issue of whether Kodak misrepresented its ability to perform the contract during the Revision 9 negotiations was not new.  *See*, *e.g.*, *Oppenheimer & Co, Inc. v. Metal Mgmt., Inc.*, 2009 WL 2432729 at *3 (no good cause shown where, even though voluminous production underscored need for amendments, "the issue was not new"); *Ewing v. Roslyn High Sch.*, 2007 WL 1110745, *1-2 (E.D.N.Y. 2007) (no good cause to sue defendant in his individual capacity where plaintiffs "did not realize the full extent of [defendant's] involvement" until "all the facts were synthesized" at the summary judgment stage of the proceedings).

       In sum, I find that DuPont has not shown good cause to amend its answer following the deadline set in the scheduling order.  I also find that DuPont's claims of misrepresentation based upon Sirton's emails would be futile under Delaware law.  Accordingly, I recommend that the district court deny DuPont's motion to amend its answer and counterclaim in its entirety.

## <u>CONCLUSION</u>

For the reasons stated above, I recommend that defendant's motion to amend their answer and counterclaim **(Docket # 33)** be **DENIED**.  In addition, DuPont's motion to file a supplemental declaration **(Docket # 65)** is **DENIED as MOOT**.

**IT IS SO ORDERED.**


        *s/Marian W. Payson*
                MARIAN W. PAYSON
                United States Magistrate Judge

Dated: Rochester, New York
       September   23  , 2011

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b), 6(a) and 6(e) and Local Rule 72.3(a)(3).

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See e.g. Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
September __23__, 2011

18